## THE NICOLINE MAERSK.
### No. 261.

District Court, D. Massachusetts.
Oct. 13, 1931.

Francis J. Carney and Paul E. Troy, both of Boston, Mass., for plaintiff.

G. Philip Wardner, of Boston, Mass., for defendant.

BREWSTER, District Judge.

This libel is brought against the S. S. Nicoline Maersk to recover for personal injuries which the libelant alleges were sus-

tained while working as a stevedore on board the vessel when a cargo of lumber was being loaded at San Francisco, Cal. The owner of the vessel appears as claimant.

### Findings of Fact.

On July 3, 1928, the Nicoline Maersk was taking in a cargo of redwood lumber. The vessel was under charter, which provided that the charterer should arrange and pay for all loading and unloading. The vessel was being loaded by the Schirmer Stevedoring Company. The libelant and one Saks were both employees of the stevedoring company, and were below piling the lumber in the wings as it was lowered through No. 5 hatch. Some time during the morning of July 3, 1928, a slingload of lumber was lowered into the hold in such a manner that the lower end struck the floor, the load falling over upon the libelant, striking him in the middle of the back as he was stooping to pick up a piece of lumber which lay under the square of the hatch. He was thrown to the floor and held there until the load was lifted. I find that he then received injuries to his back which will be considered later in my findings respecting damages.

First, as to the *Liability* of the vessel. It is not easy to fix the responsibility for this accident. This issue was tried on depositions taken some two years after an event which was not at the time regarded as one involving serious consequences. The libelant offered, together with his own, the depositions of two winchmen and the hatch tender. The claimant had only the deposition of the third officer, Larssen, and the longshoreman Saks who was working in the hold with the libelant. Naturally the recollections of the eyewitnesses to the accident do not in all respects agree. However, from their testimony the following details are fairly well agreed upon:

The vessel lay with her port side next to the wharf from which lumber was being loaded. Her equipment for loading included a midship winch on the starboard side and a yardarm winch on the port side. They were located between the house and No. 5 hatch, the hatch nearest the stern. Forward of the midship winch and about 4 feet from it was a door in the house leading to a galley. The winches were driven by electricity, and were controlled by a wheel which was turned as the load was hoisted or lowered. The midship winch was operated by one Johnson and the yardarm winch by one Stephens, and Svenden was hatch tender. All were employees of the Schirmer Stevedoring Com-

pany. In the process of loading, the yardarm winch was used to hoist the slingload until it would clear the deck cargo, and then the midship winch would draw it across the deck, and, when it was over the hatch, the yardarm winch would "let out slack," the midship winch taking the load and lowering it into the hold. The hold was about 25 feet below the main deck.

Respecting the load that fell on the libelant, the ship's officer and the libelant's witnesses agree that it was hoisted and brought over the hatch in the usual way, and that, as it was being lowered by the midship winch, something happened to cause slack to accumulate in the wires of that winch, forming a kink or "slack bight," so that, when on lowering the load this slack was reached, the weight of the load caused it to suddenly drop. The extent of the drop and the cause of the accumulated slack are disputed facts. According to Larssen, the operator of the midship winch, Johnson, was sitting upon a board which blocked the door leading to the galley, and a sailor, whose name Larssen was unable to recall, and whom the claimant has been unable to locate, complained that he could not go through the door unless Johnson removed his seat, and, when Johnson refused to do so, the sailor was told to remove it himself. The sailor did so, whereupon Johnson berated the officer. At the precise moment when the board was removed, no load was on either winch, and the load only fell about 3 feet when the slack was fully taken up. From this evidence it could be found that the act of the sailor in removing the board was not a contributing cause to the accident. The inference would be that Johnson was so much concerned with his quarrel with the mate that he was not attending strictly to his duties, and carelessly allowed the wire of his winch to kink on the drum. The libelant's witnesses, however, tell quite a different story, and out of the conflicting testimony I make the following findings which appear to me to be supported by the weight of evidence and the probabilities of the case:

I find that Johnson was standing upon a platform which he had constructed and which was raised about 8 inches above the deck floor. This platform interfered with any one who desired to pass through the door to the galley. This was called to Johnson's attention, who refused to remove the obstruction, whereupon the mate reached down and pulled away the boards upon which Johnson was standing, causing him to slip or fall. As he slipped, or as he attempted to regain

his balance, he turned the wrong way the wheel controlling his winch, causing a slack bight to form. When the board was thus removed, a slingload had been hoisted over the ship's side, and Johnson was just about to draw it across to the hatch. Neither the hatch tender nor Stephens at the yardarm winch knew of the slack bight, and Stephens let out slack, throwing the full weight on Johnson's winch before he (Johnson) could do anything to prevent the sudden drop which caused the load to fall rapidly until its lower end hit the floor of the hold and fell upon Polite with sufficient force to cause the injuries complained of.

The conclusion follows that the act of the third mate, Larssen, in removing a board upon which the winchman Johnson was standing, just as he was bringing over the hatch a slingload of lumber, was the proximate cause of the injury. I so find.

■ Second. *Damages.* When the libelant was struck by the falling load, he immediately complained that his back was hurt, but continued with his work that day, and until November, 1928, he worked on and off when there was stevedoring to do. In the meantime he had suffered pain, and on two occasions had been obliged to lay off for a few days on account of his back. He strapped himself up with an army belt, and applied heat to his back and tried home remedies, but received no medical advice or treatment until early in November, when he was sent to a physician by the insurance company which carried the insurance under the Longshoremen's & Harbor Workers' Compensation Act (33 USCA §§ 901–950). X-ray photographs were taken on November 2 and 5. From the X-ray plates and the clinical examination then made, it was found that Polite had sustained a compression fracture of the twelfth dorsal vertebra. There was no injury to the spinal cord. X-ray plates, made in January, 1930, showed, according to libelant's expert, no indication of "any backward displacement either of the cartilage or the bone." Nature's process for repairing an injured vertebra is analogous to that in repairing other bones of the body, but in case of a fractured vertebra there is a bridging to contiguous vertebral bodies. Where this takes place, there will be a stiffness of the back, but, if only one vertebra is fractured, the stiffness will not appreciably interfere with the flexibility of the back or impair its mechanical efficiency. Under proper care and treatment it takes from 4 to 7 months for the repair of the fractured bone and a longer time for the bridging to adjacent vertebræ, depending on the completeness of the bridge. Polite has done no work since he reported the accident in November, 1928, but I am not able to find that during that period he has been totally incapacitated for any gainful employment. Although his injuries were not severe enough to prevent him from carrying on his employment, involving the lifting of heavy freight, for a period of four months, I find that even after November, 1928, proper care and treatment of his injury necessitated his giving up work for a period of time reasonably necessary to allow a readjustment of the muscles affected by the crushing of the vertebra and a gradual resumption of activities under conditions of protection by supports. I find that his total disability was only temporary, and, while some of the results of his accident will be permanent, there is no permanent impairment of his ability to earn a livelihood. The libelant at the time of his injury was 42 years old. He was earning 90 cents per hour for a day of eight hours and $1.35 per hour for overtime. I find in the evidence no adequate basis for determining what Polite had received or might have earned had he not been injured, in excess of his regular wages. I assess the damages at $4,500.

■ Third. *Laches.* Libelant's injuries were sustained July 3, 1928. He first consulted legal and medical advice in November, 1928. This libel was filed March 7, 1930. An earlier libel was filed on June 20, 1929, in the Northern District of California, but no process was taken out, as the boat was not then within the jurisdiction of that court. Proctors for the libelant used reasonable diligence to ascertain if and when the boat was to be within the Northern District of California, and in February, 1930, they learned that she had stopped at San Pedro in the Southern District of California, and was then bound for Providence, R. I. They caused her to be libeled in Boston March 7, 1930. Between the date of the accident and November, 1928, the vessel touched California ports four times. She was in San Francisco September 30, 1928, to October 2, 1928, and again October 16, 1928, to October 20, 1928. Between November, 1928, and March 7, 1930, the Nicoline Maersk was not within the Northern District.

Neither the libelant nor his proctors gave the owners of the vessel any notice of the claim, and it was not until they received word of the libeling of the vessel that the owners learned of the injury or that Polite was

making any claim for damages. As soon as the libel was brought, the claimant was advised as to the nature of the injury and the alleged cause of it, and the owners at once communicated with the officers who were on the Nicoline Maersk on July 3, 1928. Only the third mate, Larssen, and a radio operator had any knowledge of the altercation between Larssen and Johnson, and the latter was not an eyewitness to what occurred.

■ **Fourth.** *Compensation.* It is further urged in defense by the claimant that the libelant elected to receive compensation under the Longshoremen's & Harbor Workers' Compensation Act (Act March 4, 1927, c. 509, 44 Stat. 1424 [33 USCA § 901 et seq.]). On this issue I find that in November, 1928, Polite and the Federal Mutual Liability Insurance Company, which had insured the employer, entered into an agreement whereby the insurance company agreed to advance, as a loan pending litigation against the vessel, weekly sums of $16.66. Such advancements were made. These advances were somewhat less than the compensation which Polite could probably claim, at least during the period of total disability. On December 1, 1928, and before any advances had been made, Polite filed, under section 33 (33 USCA § 933), an election to proceed against a person other than the employer. Later, on July 2, 1929, he duly filed a claim for compensation to preserve his rights to any compensation that might be due him in excess of the amount of his recovery in his suit against the vessel, all as provided in section 13 and section 33 of the act (33 USCA §§ 913, 933). The deputy commissioner ordered that the proceedings be indefinitely postponed to await the outcome of the suit against the vessel, and no award has yet been made in the compensation proceedings. Some of the checks (about one-third of those in evidence) carried on their face the words "Compensation advance made to R. Polite in accordance with agreement." On the other two-thirds the word "compensation" did not appear. I find that all the payments were intended as loans to Polite, to be repaid by him, or, in any event, to be applied on any excess that might later be awarded in the compensation proceedings.

### Conclusions of Law.

**I.** *Liability.* I rule that the act of the third mate, Larssen, was negligence resulting in the injury complained of. It is argued that the act, if negligent, was, under the circumstances, an act for which the charterers rather than the vessel is liable. In other words, that he was acting as servant for the charterer instead of the shipowner, inasmuch as under the charter the charterer was to arrange for and pay for loading, and since the charterer had, in fact, employed the stevedoring company. While it is true that the act of the third mate in pulling the plank out from under the winchman interfered with the work of loading, it by no means follows that the act had such a relation to the work as to give rise to the relationship of master and servant between the mate and the charterer or the stevedoring company. The mate, so far as appears, was engaged in the business of the ship, and found that the platform on which an employee of the stevedoring company was standing was in his way, and proceeded negligently to remove the obstruction. For this want of due care on the part of her officer I hold that the vessel is responsible.

**II.** *Laches.* I have found that the proctors for the libelant exercised due diligence in relation to proceedings in court, but it is, not so clear that diligence was shown in advising the shipowners of the existence of the claim. If they had lost proof or otherwise were prejudiced so that it would be inequitable to require them to defend a libel brought nearly two years after the alleged claim arose, I would be inclined to regard the claim as stale and to hold that the defense of laches was a valid defense. But I am unable to see how the delay has deprived the owners of ample opportunity to present all the material evidence at any time at its command. It is suggested that the delay has prevented the owners from producing the sailor who, according to Larssen, removed the board, but, with a list before him of all the crew then on the boat, Larssen was unable to identify the sailor, and the great weight of the testimony is to the effect that no sailor was present at the time. I have so found. It is my opinion, therefore, that the libelant has not lost his rights against the vessel by reason of the delay in giving notice to the owners of his claim.

**III.** *Compensation.* Section 33 of the Longshoremen's & Harbor Workers' Compensation Act provides that, if an employee who is injured in his employment determines that some person other than the employer is liable in damages, he may elect by giving notice to the deputy commissioner to receive compensation or to recover damages, and if he accepts compensation, whether he has given notice of his election or not, the statute op-

erates to pass by assignment the rights of the employee against such third person. In the case at bar Polite duly filed notice of his election to proceed against the third person. It is not necessary to decide what would be the effect of the acceptance of compensation after this notice, as I have found that it was the mutual intention of the parties that the sums paid Polite by the insurance company were not to be treated as payments of compensation under the act except possibly so far as they might be regarded as advance payments on account of any excess that the insurer might be subsequently called upon to pay under section 33 (f) of the act (33 USCA § 933(f). I do not see how such an arrangement would be enough to work an assignment of libelant's rights to proceed against a third party and thereby defeat his rights to recover in these proceedings. The cases of Hunt v. Bank Line (C. C. A.) 35 F.(2d) 136 and Sciortino v. Dimon S. S. Corporation (D. C.) 39 F.(2d) 210, are clearly distinguishable on the facts. In both of these cases compensation was accepted, and no election to recover from a third party was made.

IV. *Damages.* I have assessed damages because all the evidence which either party desired to offer on that phase of the case was before me, and the proctors joined, as I recall it, in a request that, if Polite were entitled to recover, I determine the amount of the recovery.

I have found that $4,500 would be a reasonable amount to award for pain and suffering, for loss of earnings, and for impairment of libelant's capacity to earn in the future so far as the same are attributable to the injury, and I rule that he is entitled to recover that amount in this suit.